Slip Op. 18 - 76

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| LA MOLISANA S.p.A, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Before:  R. Kenton Musgrave, Senior Judge |
| | : Court No. 16-00047 |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant, | : |
| | : |
| and | : |
| | : |
| NEW WORLD PASTA CO. and | : |
| DAKATA GROWERS PASTA CO., | : |
| Defendant-Intervenors. | : |
| | : |

**OPINION AND ORDER**

[Sustaining remand results on 18th administrative review of certain pasta from Italy.]

Decided:  June 21, 2018

*David J. Craven*, Travis & Rosenberg, of Chicago, IL, for the plaintiff.

*Elizabeth A. Speck*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant.  On the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director.  Of Counsel was *Natan P.L. Tuban*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

*Paul C. Rosenthal* and *David C. Smith*, Kelley Drye & Warren LLP, of Washington, DC, for the defendant-intervenors.

Musgrave, Senior Judge:  This opinion concerns the results of remand of the 18th

administrative review ("AR") of the antidumping duty order on certain pasta from Italy pursuant to

the prior opinion on the matter. *See* Slip Op. 17-111 (Aug. 23, 2017).[1]  Familiarity with that decision

is here presumed.   To the International Trade Administration, U.S. Department of Commerce

("Commerce" or "Department"), two issues were remanded: (1) whether Commerce failed to provide

meaningful opportunity for addressing the agency's differential pricing analysis; and (2) whether

Commerce erred in requiring the plaintiff La Molisana S.P.A ("La Molisana" or "LM") to report its

pasta sales product shapes in conformity with the existing identities and categories of shapes on

Commerce's pasta shape classification list.   On remand Commerce reconsidered the record and

arguments presented by La Molisana on both issues.

I

The "Final Results of Redetermination Pursuant to Court Remand"

("Redetermination"), now on the record (R-PDoc 3), addressed La Molisana's arguments with

respect to the differential pricing issue as raised in its administrative case brief, PDoc 208 (Oct. 6,

2015), and via response to La Molisana's comments on the draft remand results, R-PDoc 2 (Nov.

1, 2017), by noting that the *Apex Frozen Foods* decisions' upholding[2] of the application of zeroing

when using the average-to-transaction comparison methodology of  19 U.S.C. §1677f-1(d)(1)(B)

disposed of La Molisana's methodological arguments, and with respect to La Molisana's seasonality-

of-product argument the Redetermination states that there was no analysis or evidence on the record

---

[1] *See also Certain Pasta From Italy: Final Results of Antidumping Administrative Review; 2013-2014*, 81 Fed. Reg. 8043 (Feb. 17, 2016), and the accompanying issues and decision memorandum, PDoc 228, as amended by *Certain Pasta From Italy: Amended Final Results of Antidumping Duty Administrative Review; 2013-2104*, 8l Fed. Reg. 12690 (Mar. 10, 2016).

[2] *Apex Frozen Foods v. United States*, 862 F.3d 1322 (Fed. Cir. 2017) (7th Review); *Apex Frozen Foods v. United States*, 862 F.3d 1327 (Fed. Cir. 2017) (8th Review).

to support it. The Redetermination also notes that the court had recently found no statistical error inherent when the entire population of respondents' sales in the United States market is analyzed for differential pricing and held the use of "widely accepted thresholds" for the Cohen's *d* coefficient not arbitrary.  Redetermination at 13-16, noting *Xi'an Metals & Minerals Import & Export Co. v. United States,* 41 CIT ___, ___, 256 F. Supp. 3d 1346, 1364 (2017).

In its comments here, La Molisana continues to believe that differential pricing analysis is nothing more than "zeroing in a disguise and that ultimately it will be found to be a violation of the United States' WTO obligations"[3], but since the issue has been upheld in other cases La Molisana offers no further comment on the Redetermination.  Suffice it to state at this point that substantial evidence and law support the Redetermination on this issue.

II

With respect to the issue of shape classification, La Molisana in its administrative case brief had requested reclassification of several specialty cuts, coded as category "6" in Commerce's shape list, to be reclassified as regular short cuts, coded as "5," solely on the basis of its own production line speeds.  *See* PDoc 208.  On remand, Commerce maintains that its prior final results are correct in denying La Molisana's request.  Redetermination at 5.

The Redetermination states that Commerce has a statutory duty to uphold a stable and consistent model match methodology; that the model match methodology for this antidumping

---

[3]  That is debatable, as it was arguably *that* organization that violated *its* obligations to *this* country over this country's extant methodology of zeroing when the WTO -- and the Antidumping Agreement in particular -- came into being.  *See*, *e.g.*, Roger P. Alford, *Reflections on US--Zeroing: A Study in Judicial Overreaching by the WTO Appellate Body*, 45 Colum. J. Transnat'l L. 196 (2006).  *Cf. Xi'an Metals*, 41 CIT at ___ n.10, 256 F. Supp. 3d at 1360 n.10 *with Catfish Farmers of America v. United States,* 38 CIT ___, ___, Slip Op. 14-146 at 38 (2014).

proceeding was developed during the original investigation and refined during the subsequent three

administrative reviews, and that its long-standing practice is that once a model-match methodology

has been established, it will not modify that methodology in subsequent proceedings unless there are

compelling reasons to do so;[4] that reclassification of shapes must be supported by industry-wide and

not company-specific technical information; that company-specific information in support of a

modification of the shape list must relate to a *new* shape classification; and that allowing

company-specific shape *re*classifications would render the model-match criteria unpredictable,

volatile, and inconsistent. *Id*. at 5-13, 19-31.  Commerce's main concern in this regard appears to

be the potential for manipulation of U.S. market and home market product sales, resulting in less

accurate price-to-price comparisons in the dumping margin. *See id*. at 13, 29.

   In accordance therewith, Commerce found on remand that La Molisana had not

presented any industry changes that would warrant shape reclassification, and that the information

La Molisana did place on the record was insufficient to warrant shape reclassification. *Id*. at 5, 19-

20.  Specifically, the Redetermination points out that only six out of the 20 shapes for which La

Molisana sought reclassification appear in La Molisana's product catalogue in the LM Shape

---

[4]  Redetermination at 7, paraphrasing *Fagersta Stainless AB v. United States*, 32 CIT 889, 894, 577 F. Supp. 2d 1270, 1276 (2008) ("[o]nce Commerce has established a model-match methodology in an antidumping [proceeding], it will not modify that methodology in subsequent [segments] unless there are 'compelling reasons' to do so").  "Compelling reasons" means "compelling and convincing evidence" that the existing model-match criteria "are not reflective of the merchandise in question," that there have been changes in the relevant industry, or that "there is some other compelling reason present which requires a change." *Id*. (citation omitted).  *See also*, *e.g.*, *Notice of Final Results of Antidumping Duty Administrative Review: Certain Pasta from Italy*, 78 Fed. Reg. 9364 (Feb. 8. 2013) ("AR15"), and accompanying issues and decision memorandum ("I&D Memo") at cmt 1, and *Notice of Final Results of Antidumping Duty Administrative Review: Certain Pasta from Italy*, 67 Fed. Reg. 300 (Jan 3. 2002) ("AR4"), and accompanying I&D Memo at cmt 19, both of which the parties here discuss in the context of their respective positions.

Exhibits, and that La Molisana had not provided descriptions or pictures for 14 of the 20 shapes for which it had requested reclassification.[5]  Redetermination at 4.  La Molisana's comments disagree that information is "missing" from the record, as the issue here is only the throughput rate, not whether a cut is short or long, *e.g.*, R-PDoc 2 at 2-3, but be that as it may, the administrative position expressed in the Redetermination is that the information on the record does not support reclassification regardless, as the information is company-specific (*e.g.*, production speed), and, as mentioned, Commerce's policy is only to consider company-specific information when it relates to new shapes not already on the existing shape classification list.  Commerce then reiterated that all of La Molisana's proposed reclassifications pertained to shapes that were already identified on the shape list.  *E.g.*, Redetermination at 5 ("all of the shapes that La Molisana sought to reclassify are on the Department's shape list").

As Commerce points out, *Prodotti Alimentary Meridionali, S.R.L. v. United States*, 27 CIT 547, 548-50 (2003) ("*PAM*"), upheld the shape model match methodology as reasonable. *PAM* considered argument over two shapes, short cuts and soup cuts (or soupettes), that were listed on the shape list as category 5 and category 7, respectively, and that were "produced on the same machine."  *PAM* at 548.  Because their production speeds were "very similar", the *PAM* plaintiff requested Commerce to "merge" the two product categories.  That was effectively an "industry-wide" request, but Commerce declined.  Because the same pasta shapes could be produced on different machines, the court agreed with Commerce that the similarities in machine type used

---

[5]  *See* LM Resp. to Sections B & C of the Initial Questionnaire ("IQ") (Dec. 2, 2014), CDocs 38-54, at Exs. B-1 & C-1; *see also* LM Resp. to Sec. A of the IQ (Nov. 5, 2015), PDocs 34-39, at Ex. A-13(a).

should not be determinative.  Further, "[e]ven if certain products are produced on the same machines at similar speeds, that does not necessarily establish that they are the same product, even if they might be used in a similar manner."  *Id.* at 549.  Therefore, the *PAM* plaintiff had "not demonstrated a flaw in the model match methodology which requires its amendment."  *Id*.

Although it was in the context of the record presented thereat that *PAM* held the model-match methodology reasonable, and the matter at bar is the inverse of that case, the result here is ultimately the same.  Commerce's position is that AR15's acknowledgment of the 75 percent throughput rate to distinguish pasta shape for specialty long and short pasta cuts was only a part of the description of the development of the model-match methodology in the original investigation and its refinement in subsequent reviews, which circumstance "does not indicate that it is [only] production speed, [as opposed to] sales characteristics, [that] distinguishes special and regular cuts, as La Molisana claims" nor does it "validate La Molisana's use of its line speeds to reclassify shapes that are already on the Department's shape list."  Redetermination at 12.  Commerce also contends La Molisana's description of AR4's acceptance of reclassifying the certain pasta shapes considered therein is inaccurate, as that administrative review considered shapes that were not already listed on the shape classification list.  *See* Def's Resp. to Comments at 9-10, quoting Redetermination at 24 (quoting AR4 I&D Memo at cmt 18).[6]

---

[6] *Inter alia*:

We have developed a list of pasta cuts and their corresponding shapes in which standard and specialty cuts are segregated based on line speed.  However, we understand that there may be discrepancies between the shape category list we provide respondents in the questionnaire and their own production which would result in a different classification of certain cuts or the manufacturer may produce certain cuts not listed by the Department.  Therefore, the instructions to the

(continued...)

The first contention obscures that La Molisana's focus is solely upon the 75 percent

production speed demarcation; the other three considerations of the shapes methodology are not

relevant to that argument.  *Cf. New World Pasta Co. v. United States*, 28 CIT 290, 309 n.22, 316 F.

Supp. 2d 1338, 1355 n.22 (2004) ("line speed is a shorthand for shape").  The second contention is

imprecise.[7]  The defendant intervenors provide a rather fuller response, in contending that AR4

---

[6] (...continued)

questionnaire specifically state that if the respondent sold any pasta cuts which the
Department does not list, the respondent should provide a description and picture of
the pasta type, the production line on which it is produced, the standard production
capacity of that line (*e.g.*, pounds per hour), and the line speed, for the pasta type in
question.

In its questionnaire response, we noted that there were certain cuts which PAM added
to its production which were either not listed by the Department or PAM considered
the cut to be a shape different than the one listed by the Department (i.e., PAM
classified a cut to be a standard cut whereas the Department categorized it as a
specialty cut). Therefore, we specifically requested from PAM the company-specific
line speed data necessary to classify those cuts in question. PAM submitted the line
speed data and contended that certain shapes should be classified as a specialty rather
than standard (or vice versa). We accepted the shape classifications that PAM
claimed based upon the PAM line speed data that it provided.

AR4 I&D Memo at cmt. 18.

[7]  Noted here, in AR15 Commerce described a certain respondent's characterization of AR4
as "inaccurate" through the following explanation:

In the fourth review, the Department verified the physical differences, cost
differences, and throughput rate differences between the Teflon-die production
technology and the older, more traditional bronze-die production technology for
Ferrara products. . . . The Department had not previously reviewed the differences
between these two production technologies in prior reviews where the model match
methodology was developed.  In the final results of the fourth review, *the
Department allowed Ferrara to use a five-digit CONNUM, instead of a four-digit
CONNUM*[,] *to account for the differences between bronze-die pasta and Teflon-die
pasta for purposes of model matching. . . .*  However, all companies used the same

(continued...)

"wrongly" implied pasta shapes might be re-classified based on a company's own line speed, wherein Commerce explicitly stated: "For those cuts which PAM believed were specialty cuts yet the Department considered a regular cut (or vice versa), [PAM] provided the line speed data. We reviewed this information and accepted the revised shape classification as provided by PAM." AR4 I&D Memo at cmt 19. *Cf. also* notes 6 & 7. The court expresses no opinion on the "correctness" of AR4, but the defendant intervenors are themselves correct in arguing that AR4 apparently stands apart from every other review by inclusion of this language. The court thus agrees that AR4 cannot be construed to amount to an administrative practice. *Cf. Huvis Corp. v. United States*, 31 CIT 1803, 1811, 525 F. Supp. 2d 1370, 1378-79 (2007) (more than two instances required for a specific administrative action to evolve into a practice), citing *Shandong Huarong Machinery CO. v. United States*, 30 CIT 1269, 1293 n.23, 435 F. Supp. 2d 1261, 1282 n.23 (2006).

In the final analysis, La Molisana's comments here, on *PAM* and on AR4 and AR15, do not persuade that the results of redetermination can be concluded unsupported by substantial evidence on the record and not in accordance with law under the "reasonableness" standard of reviewing Commerce's methodologies. *See, e.g.*, *Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337, 1350 (Fed. Cir. 2017); *JBF RAK LLC v. United States*, 790 F.3d 1358, 1364 (Fed. Cir. 2015). La Molisana does not dispute the "industry-wide" shape classification list itself, and it

---

[7] (...continued)
shape codes in the CONNUMs. Thus, in the reviews cited by Granoro, the change accepted by the Department was based on the differences between bronze die and Teflon-die production methods *and outcomes*. Although we found that the *physical* and *cost* differences of products produced using these two different methods *merited separate treatment*, this was not a change to the reported variables used to create the CONNUM that we use for model matching purposes.
*Id*. (italics added).

further agrees that a "stable and consistent model-match methodology" is desirable. Its argument is simply for recognition of the purported fact that certain of its shapes, which appear on the shape classification list as having been produced at line speeds corresponding to "special" cut categories or designations, had actually been produced at line speeds corresponding with "standard" (or regular) cut line speed categories or designations. *See*, *e.g.*, LM Comments at 2-3 ("[t]hat application of this methodology means that a particular shape might be classified one way for one producer and another way for another producer does not mean that the methodology has changed -- it simply means that the underlying facts changed, and [that] the methodology produced a different result); *id*. at 5 ("[t]here may be 'discrepancies between the shape category list we provide respondents in the questionnaire and their own production which would result in a different classification of certain cuts' ") (quoting AR4 I&D Memo at cmt 18; emphasis removed).

        Unfortunately for La Molisana, Commerce's policy is firm with respect to company-specific requests for reclassification of shapes already identified on the shape list. Of course, costs are a metaphysical aspect of the physical characteristics of a good-- they are undoubtedly what drove the "dividing line" of the shape list between regular and specialty cuts for model matching purposes in the first place[8] -- and Commerce acknowledges that slower line speeds have higher manufacturing costs associated with them. Hence, insistence that certain shapes remain within the respective categories associated with slower "specialty" line speeds when record evidence supports actual production of those shapes at higher "standard" cut line speeds might seem to imply that the determination is unsupported by substantial evidence of record. Nonetheless, as indicated, La

---

        [8] *See*, *e.g.*, AR15 I&D Memo at cmt 1 (describing the use of a 75 percent throughput rate to distinguish pasta shape for specialty long and short pasta cuts in the original investigation).

Molisana's argument is contrary to Commerce's stated policy, and the court must defer to Commerce's concerns regarding the potential for manipulation.  La Molisana argues Commerce's reasoning faulty, *i.e.*, that

> with respect to the other items that make up the control number, volitional decisions by the Pasta Manufacturer enter into whether or not a product is assigned a specific code. The quality code is impacted by the decision by the producer as to the specific blend of wheat used (or even by the label placed on the bag), the additive code by the decision whether or not to use an additive, and the enrichment code by the decision whether or not to use an enrichment. Each of these is based on a volitional choice by the producer. To the extent that line speed is a volitional choice, it is no different than any of these other criteria. In fact, even the "shape code" would be "subject to manipulation" by the simple step of giving the existent product a "new name" and seeking its classification based on company specific line speeds. (Elbow Macaroni, the exemplar for "standard short", could be renamed L-Bro Macaroni and thus have its classification reconsidered.)
>
> More critically, the reason that product is divided between Special and Standard cuts is the reality that special cuts are costlier to manufacture. (*See* 4th POR I&D at Issue 18. ) Slowing down the line speed would result in a higher cost of production. It is axiomatic that a producer will, therefore, operate at the fastest production speed to minimize the costs of production. A specialty cut, because of the slower line speed, will have a higher cost, as reflected in the Section D data and will be sold at a higher price as reflected in the Section B and C data.

LM Comments at 7-8 (italics added).

All of which may well be true.  But it is insufficient to address Commerce's concerns regarding the potential for manipulation, via company-specific reclassifications of existing shape categories on the shape list, of U.S. market sales and home market sales comparisons.  Commerce might just as readily have concluded pasta shapes for which La Molisana sought reclassification to be "new" shapes due to line speed, *cf.* note 7, but the court cannot reweigh the evidence or substitute judgment therefor.  *See*, *e.g.*, *Usinor v. United States,* 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004).  In short, La Molisana does not persuade the remand results are erroneous.

*Conclusion*

After considering the arguments on the results of redetermination, La Molisana does not persuade that the Redetermination is unsupported by substantial evidence on the record or otherwise not in accordance with law.  Judgment will enter accordingly.

**So ordered.**

/s/  R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Dated:  June 21, 2018
        New York, New York